IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID ALLEN MYERS, §
§
Plaintiff, §
§
v. § CIVIL ACTION NO. H-17-1589
§
NANCY A. BERRYHILL, §
ACTING COMMISSIONER OF THE §
SOCIAL SECURITY ADMINISTRATION, §
§
Defendant. §

### MEMORANDUM OPINION

Pending before the court[1] are Plaintiff's Motions for Summary Judgment[2] (Docs. 16 & 19) and Defendant's Cross-Motion for Summary Judgment (Doc. 20). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motions.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Doc. 18, Ord. Dated Feb. 15, 2018 .

[2]    Although Plaintiff did not title these pleadings as motions, he seeks a judgment in his favor in each.

Act ("the Act").

## A. __Medical History__[3]

Plaintiff was born on October 16, 1958, and was forty-five years old on the alleged disability onset date of February 6, 2004.[4]

On February 8, 1996, Plaintiff injured his right knee when he slipped and fell while working for the United States Post Office.[5] On November 1, 1996, an MRI of Plaintiff's knee revealed a tear of his medial meniscus.[6] Plaintiff underwent surgical treatment on his right knee.[7] Plaintiff then re-injured his right knee in October 1997 and again in December 1998.[8] Due to continuing issues with his right knee, Plaintiff began receiving steroid injections in his knee.[9]

On March 18, 1999, Plaintiff underwent an arthroscopic evaluation and treatment procedure to repair his right knee after an MRI revealed a torn medial meniscus.[10] During the surgery, the

---

[3]    Plaintiff attached additional medical evidence to his complaint that was not part of the administrative record. As discussed below, this new evidence is not material. Accordingly, it is not considered in this section.

[4]    See Tr. of the Admin. Proceedings ("Tr.") 13, 58.

[5]    See Tr. 363-65, 400.

[6]    See Tr. 373.

[7]    See Tr. 370.

[8]    See Tr. 370, 400.

[9]    See Tr. 368-72.

[10]   See Tr. 341.

surgeon discovered that Plaintiff also had a "grade II chondromalacia medial tibial plateau," and a "grade II chondromalagcia medial femoral condyle and lateral tibial plateau."[11] The following procedures were performed during the surgery: (1) "arthroscopic partial medial meniscectomy;" (2) "chondroplasty medial tibial plateau;" (3) "chondroplasty medial femoral condyle;" and (4) "chondroplasty lateral tibial plateau."[12]

As a result of his prior accidents and post-surgery gait, Plaintiff began to have back problems.[13] On July 8, 1999, Plaintiff underwent an MRI of his back that revealed a disc herniation at the L5-S1 disc.[14] To help with his back issues, Plaintiff began physical therapy.[15] In December 2000, Plaintiff's doctor determined that after several years of failed conservative treatments, a surgical procedure was necessary.[16] On January 9, 2001, Plaintiff underwent "mini-open retro-peritoneal exposure lumbar spine surgery," and "anterior lumbar interbody decompression & fusion surgery" for his "degenerative disc disease, L5/S1, [and] lumbar radiculopathy."[17]

---

[11] See Tr. 341.

[12] See Tr. 341.

[13] See Tr. 369, 372.

[14] See Tr. 367.

[15] See Tr. 459-62.

[16] See Tr. 456-58.

[17] See Tr. 336, 384-98.

Following his back surgery, Plaintiff began a routine of physical therapy and was instructed to take anti-inflammatory medications as needed.[18] In November 2001, Plaintiff was given an injection in his back and was told that he was able to begin working light duty for four hours per day.[19] Plaintiff was to refrain from any heavy lifting, carrying, or bending.[20]

There is a lengthy absence in Plaintiff's medical records before Plaintiff began experiencing back pain again in March 2004.[21] In April 2004, a CT scan was taken of Plaintiff's back. The CT scan revealed that Plaintiff had disc bulges at his L3-4 and L5-S1 discs.[22] At a follow-up appointment in February 2005, Michael Shapiro, M.D. ("Dr. Shapiro"), found that Plaintiff had lumbago, a lumbar sprain, lumbar disc degeneration, and adjacent disc pathology.[23] Plaintiff's difficulties with his back continued and, in March 2005, Plaintiff began receiving injections in his back.[24] Although the exact date is unclear from the record, Dr. Shapiro found that Plaintiff was "totally disabled from work activity" as

---

[18]  See Tr. 448-56.

[19]  See Tr. 447.

[20]  See Tr. 447.

[21]  See Tr. 444-45.

[22]  See Tr. 375.

[23]  See Tr. 443.

[24]  See Tr. 433-41.

early as September 2005.[25]

In October 2005, Plaintiff was seen for a increase in pain and mechanical popping in his knees.[26] John Feder, M.D. ("Dr. Feder"), diagnosed Plaintiff with osteoarthritis in both knees.[27] At the time, Plaintiff was able to walk unassisted.[28] In November 2005, after continued difficulties with lower back pain, Dr. Shapiro diagnosed Plaintiff with failed back syndrome.[29]

Plaintiff's medical history is not documented again until March 2008 when Plaintiff underwent another MRI of his spine.[30] The MRI revealed that Plaintiff had: (1) a "[s]light exaggeration of the mid lumbar lordosis with diffuse disc bulging and facet arthrosis contributing to mild central canal stenosis and bilateral neural foraminal narrowing at L3-L4 without nerve root compression;" (2) degenerative changes present in his "lower thoracic spine where there may be neural foraminal narrowing without cord compression;" (3) a maintained posterior fusion and preserved interbody fusion at L5-S1; (4) "no compromise of the central canal or exiting nerve roots at L5-S1;" and (5) "no

---

[25] See Tr. 431-32.

[26] See Tr. 429-30.

[27] See Tr. 429-30.

[28] See Tr. 429-30.

[29] See Tr. 426-27.

[30] See Tr. 424.

abnormal enhancement [] present following administration of intravenous contrast material."[31]

Another MRI of Plaintiff's back was taken in October 2008.[32] The MRI revealed that Plaintiff had: (1) "mild disc degeneration at multiple levels in [his] upper midthoracic spine;" (2) "disc extrusions at nearly every level" with the largest being to the left at T4-5; and (3) encroachments by the extrusions to a "mild degree upon the left anterolateral aspect of [his] spinal cord."[33]

In July 2009, Plaintiff went in for a check up with continued back pain. Dr. Shapiro stated that Plaintiff's status was unchanged and he remained with pain and complete impairment.[34] In August 2009 Plaintiff went in for an appointment with Dr. Feder complaining of pain in both knees. Dr. Feder found that Plaintiff had an internal derangement of his knee joint and prescribed a physical therapy plan.[35]

The rest of Plaintiff's medical history occurred well after his date last insured ("DLI") and, for the reasons discussed below, will not be recounted here.

**B.   Application to SSA**

---

[31]     See Tr. 424.

[32]     See Tr. 423.

[33]     See Tr. 423.

[34]     See Tr. 421-22.

[35]     See Tr. 419-20.

Plaintiff applied for disability insurance benefits on April 9, 2013, claiming an inability to work since his disabling condition occurred on February 6, 2004.[36] Plaintiff claimed the following disabling conditions: (1) depression; (2) anxiety; (3) high blood pressure; (4) spinal fusion with stenosis and herniated discs; (5) surgery on both knees; (6) hip problems; (7) arthritis; and (8) chronic pain.[37] On May 15, 2013, Plaintiff completed a disability report, where his alleged conditions were not listed, but he claimed to have difficulty sitting, standing, and walking.[38] Plaintiff completed another disability report on October 2, 2013, where again, he did not list his alleged conditions, but did state that his abilities to sit, stand, kneel, squat, sleep, and remember were affected and that he suffered from anxiety and depression.[39]

On July 11, 2013, due to insufficient evidence, the SSA found Plaintiff not disabled at the initial level of review.[40] On September 20, 2013, Plaintiff requested a hearing before an ALJ.[41] The ALJ granted Plaintiff's request and scheduled the hearing on August 7, 2014.[42]

---

[36]   See Tr. 13, 129-33, 141.

[37]   See Tr. 58.

[38]   See Tr. 141-43.

[39]   See Tr. 189-194.

[40]   See Tr. 61-62.

[41]   See Tr. 72.

[42]   See Tr. 73-109.

## C.  **Hearing**

At the hearing, Plaintiff and a vocational expert, Cassandra Humphreys ("Humphreys"), testified.[43] Plaintiff was not represented by an attorney.[44]

Plaintiff testified that he lived with his wife, son, and daughter in a two-story house.[45] Plaintiff attained a high school education and completed a four-year journeyman program for sheet metal workers.[46] Plaintiff worked as a sheetmetal worker for ten years before beginning his job at the United States Postal Service ("USPS") as a mail processing machine operator in 1995.[47] Plaintiff's job as a machine operator required him to load and unload trucks and machines, and push and pull large metal bins.[48]

Plaintiff testified that he first hurt himself in February 1996 when he slipped while working at the post office.[49] As a result of the fall, Plaintiff tore his meniscus in his right leg, damaged his elbow and ankle, and bruised his back and head.[50] Plaintiff returned to work a week or two later and re-injured his

---

[43] <u>See</u> Tr. 32.

[44] <u>See</u> Tr. 32.

[45] <u>See</u> Tr. 36-37.

[46] <u>See</u> Tr. 37-38.

[47] <u>See</u> Tr. 38-39.

[48] <u>See</u> Tr. 42.

[49] <u>See</u> Tr. 40-41.

[50] <u>See</u> Tr. 40-41.

right knee in July 1996.[51]  Plaintiff's condition worsened and he underwent surgery on his right knee in November 1996.[52]  Plaintiff went back to work until 1999 when he had to have a second knee surgery on his right knee.[53]  Plaintiff's back had begun hurting during this period of time.[54]  Plaintiff kept working and, in January 2001, he required a spinal fusion surgery.[55]  Plaintiff was out of work for six months to one year following the surgery.[56] When Plaintiff returned to work he was supposed to be assigned a sedentary position, however, there were none at Plaintiff's workplace so he went back to his pre-surgery job.[57]  The exertional job requirements caused Plaintiff's back pain to recur.[58]

Plaintiff testified that by 2004, the pain medications he was taking were insufficient to sustain his level of work at the job.[59] Plaintiff's medications made him sleepy and he would occasionally have numbness in his legs causing him to fall when he was walking

---

[51]    See Tr. 41.

[52]    See Tr. 41.

[53]    See Tr. 43.

[54]    See Tr. 43.

[55]    See Tr. 44.

[56]    See Tr. 44.

[57]    See Tr. 45.

[58]    See Tr. 45.

[59]    See Tr. 46.

or standing.[60] Plaintiff claimed that he developed depression and anxiety during this period.[61] Plaintiff's anxiety made it difficult for him to sit in the back of vehicles, be in tight areas, or fly in airplanes.[62]

Plaintiff's superiors eventually became dissatisfied with his job performance in light of his health issues and, in 2004, Plaintiff was told that he had to seek workers' compensation benefits.[63] Then, in 2009, Plaintiff was told that he had to file for disability retirement or quit.[64] Accordingly, Plaintiff filed for disability insurance benefits.[65] Prior to 2009, Plaintiff claims he had been told that he could not file for Social Security benefits when he was receiving workers' compensation benefits.[66] For that reason, Plaintiff did not file for Social Security benefits until after his DLI.[67]

Plaintiff testified that at the time of the hearing he had the following problems:(1) his legs "gave out" on him regularly causing him to fall; (2) constant pain in his knees, back, and head; (3)

---

[60]   See Tr. 46.

[61]   See Tr. 46.

[62]   See Tr. 46.

[63]   See Tr. 47-78.

[64]   See Tr. 48-49.

[65]   See Tr. 48-49.

[66]   See Tr. 48-49.

[67]   See Tr. 49.

"extreme" headaches; (4) trouble sleeping due to stress or pain; (5) numbness and tingling from pinched nerves in his back; (6) randomly falling asleep; (7) anxiety; and (8) depression.[68] Plaintiff was receiving injections in his knees every six months and in his back, as needed.[69]

The ALJ questioned Humphreys next. The ALJ began by presenting a hypothetical where a person was able to: (1) do light work; (2) lift ten pounds frequently and up to twenty pounds; and (3) stand for six hours or sit for six hours.[70] The hypothetical also provided that the person would be able to sit and stand at will and could not climb ladders, ropes, or scaffolds.[71] Humphreys testified that in such a situation the person would be unable to return to Plaintiff's past relevant work.[72] She also opined that Plaintiff's skills did not transfer to any other occupations.[73] Humphreys testified that based on the stipulated situation, the hypothetical person with Plaintiff's limitations would be able to work as a shredder, laundry sorter, or garment sorter.[74]

---

[68]   See Tr. 50-52.

[69]   See Tr. 52.

[70]   See Tr. 54.

[71]   See Tr. 54.

[72]   See Tr. 54.

[73]   See Tr. 55.

[74]   See Tr. 55.

## D. **Commissioner's Decision**

On July 1, 2015, the ALJ issued an unfavorable decision.[75]  The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2009, his DLI, and that Plaintiff had not engaged in substantial gainful activity from February 6, 2004, the alleged onset date, through his DLI.[76]  The ALJ found the relevant period to be from February 6, 2004, to Plaintiff's DLI, and only considered evidence prior to Plaintiff's DLI.[77]  The ALJ recognized the following impairments as severe: "degenerative disc disease with radiculopathy; post lumbar fusion (January 2001); osteoarthritis of bilateral knees; and obesity."[78] The ALJ found that Plaintiff's severe impairments, individually or collectively, did not meet or medically equal the disorders described in the listings of the regulations[79] (the "Listings").[80] In particular, the ALJ considered Section 1.00 et seq., of the Listings.[81]  The ALJ focused on Section 1.02, major dysfunction of a joint, Section 1.04, disorders of the spine, and Section 1.00(Q),

---

[75]  See Tr. 10-27.

[76]  See Tr. 13, 15.

[77]  See Tr. 24.

[78]  See Tr. 15.

[79]  20 C.F.R. Pt. 404, Subpt. P, App. 1.

[80]  See Tr. 15.

[81]  See Tr. 16.

12

obesity.[82]   The ALJ found that Plaintiff did not meet the requirements of Section 1.02 because he was able to "ambulate and perform fine and gross movements effectively" during the relevant period.[83]   The ALJ found that Plaintiff did not meet the requirements of Section 1.04 because "he lack[ed] the requisite nerve root or spinal cord compromise with motor and sensory deficits and there is no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication."[84]   Finally, the ALJ found that Plaintiff did not meet the requirements of Section 1.00(Q) because Plaintiff's obesity did not have the requisite impact on the functioning of Plaintiff's bodily systems.[85]

In determining Plaintiff residual functional capacity ("RFC"), the ALJ discussed Plaintiff's injuries, symptoms, and medical treatment.[86]   The ALJ found that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."   The ALJ found that Plaintiff could perform light work consisting of "lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking about six hours total in an eight-hour workday; and sitting

---

[82]   See Tr. 16-17.

[83]   See Tr. 16.

[84]   See Tr. 16.

[85]   See Tr. 16-17.

[86]   See Tr. 17-25.

about six hours total in an eight-hour workday."[87]  Plaintiff's light work was subject to the conditions that he be allowed the option to sit and stand at will and he could never climb ladders, ropes, or scaffolds.[88]  The ALJ determined that, while Plaintiff could not perform his past relevant work, he could perform other jobs in the national or regional economy, such as shredder, laundry sorter, and garment sorter, and was therefore not disabled.[89]

Plaintiff appealed the ALJ's decision, and on January 4, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[90]  After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[91]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

---

[87]     See Tr. 17.

[88]     See Tr. 17.

[89]     See Tr. 25-26.

[90]     See Tr. 3-8.

[91]     See Doc. 1, Pl.'s Compl.

## A. __Legal Standard__

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act. __Wren v. Sullivan__, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a); __see also__ __Greenspan v. Shalala__, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); __Jones v. Heckler__, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be

considered to determine whether he can do other work.
Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20
C.F.R. § 404.1520.  The analysis stops at any point in the process
upon a finding that the claimant is disabled or not disabled.
Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is
"that quantum of relevant evidence that a reasonable mind might
accept as adequate to support a conclusion." Carey v. Apfel, 230
F.3d 131, 135 (5th Cir. 2000).  It is "something more than a
scintilla but less than a preponderance." Id.  The Commissioner
has the responsibility of deciding any conflict in the evidence.
Id.  If the findings of fact contained in the Commissioner's
decision are supported by substantial record evidence, they are
conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings
exist to support the Commissioner's decision should the court
overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir.
1988).  In applying this standard, the court is to review the
entire record, but the court may not reweigh the evidence, decide
the issues de novo, or substitute the court's judgment for the
Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th
Cir. 1999).  In other words, the court is to defer to the decision
of the Commissioner as much as is possible without making its

review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) not all of Plaintiff's medical information was used to form a final opinion; (2) new medical information shows that Plaintiff was disabled prior to his DLI; and (3) personnel at the USPS incorrectly told Plaintiff that he could not file for social security benefits while he was on workers' compensation.[92]  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.   The ALJ Properly Considered Only Evidence Prior to 2010

The ALJ only considered medical evidence from before December 31, 2009, Plaintiff's DLI.[93]  Plaintiff argues the ALJ erred because he failed to consider all of Plaintiff's medical information.

Plaintiff is correct that not all of his medical information was considered.  However, that was not an error by the ALJ. Material evidence relates to the period for which benefits were denied, not to later-acquired disabilities or to post-hearing deterioration of Plaintiff's condition.  Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985).  Accordingly, any medical records dated after Plaintiff's DLI are not material to the question of

---

[92]    See Doc. 1, Pl.'s Compl.

[93]    See Tr. 24.

whether Plaintiff was disabled before his DLI.  The ALJ did not err in refusing to consider Plaintiff's medical records dated after Plaintiff's DLI.

**B.  <u>Plaintiff's New Medical Evidence Cannot Be Considered</u>**

Plaintiff attached numerous new medical records to his complaint and argues that this new medical evidence shows that Plaintiff was disabled prior to his DLI.[94]

The court may remand a case to the Commissioner for further action if there is a showing that new evidence not in the record "is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).  "For new evidence to be material, there must exist the `reasonable possibility that it would have changed the outcome of the [Commissioner's] determination'" had the evidence been presented.  <u>Chaney v. Schweiker</u>, 659 F.2d 676, 679 (5th Cir. 1981).

The majority of the new medical evidence is immaterial because it dates well after Plaintiff's DLI.[95]  <u>Heckler</u>, 767 F.2d at 183. However, some of the new evidence is within the relevant time period.[96]  The new evidence includes diagnoses of: (1) "[s]tatus post lumbar decompression and fusion;" (2) "[l]umbar sprain;" (3)

---

[94]    <u>See</u> Doc. 1-1, Ex. 1 to Pl.'s Compl., New Medical Records.

[95]    <u>See</u> <u>id.</u>

[96]    <u>See</u> <u>id.</u>

"[l]umbar degenerative disc disease;" (4) "[o]steoarthritis, right knee;" (5) "[s]tatus post right knee arthroscopy and partial medial meniscectomy;" (6) "[b]ilateral knee osteoarthritis;" (7) "[r]ight sacroiliac joint dysfunction;" (8) "[b]ilateral lumbar radiculopathy;" and (9) "chronic back pain."[97] With the exception of the diagnosis of right sacroiliac joint dysfunction, these diagnoses are also found in the medical evidence that the ALJ considered.[98] The diagnoses of right sacroiliac joint dysfunction occurred on July 1, 2003, and September 11, 2003, during which time Plaintiff was able to maintain his employment.[99] The medical evidence considered by the ALJ shows that in visits occurring in early 2004 and throughout 2005, Plaintiff was no longer diagnosed with sacroiliac joint dysfunction.[100] Hence, even if the 2003 diagnosis was considered by the ALJ, it would not change his finding of not disabled.

The new evidence also includes: (1) information regarding Plaintiff's occupations before he quit working; (2) forms filled out by Plaintiff's physician for worker's compensation following his spinal fusion surgery; and (3) a 2004 letter from Plaintiff to the U.S. Department of Labor accusing his boss of refusing to

---

[97]    See id. pp. 21-22, 65-70, 72-73, 77-82.

[98]    See Tr. 427, 430, 432, 435-36, 438, 440, 443.

[99]    See Doc. 1-1, Ex. 1 to Pl.'s Compl., New Medical Records pp. 65-70.

[100]   See Tr. 375-78, 432, 435-36, 438, 440, 443-45.

accept his workers' compensation injury recurrence form.[101]  The new evidence would not have influenced the ALJ's decision had it been presented.  Accordingly, all of the new evidence attached to Plaintiff's complaint is immaterial and does not necessitate that this case be remanded.

C.    **The Court May Not Consider What USPS Personnel Told Plaintiff**

Plaintiff alleges that USPS personnel told him that he could not file for social security benefits while he was receiving workers' compensation benefits.  Plaintiff's argument falls outside the scope of the court's review.  The ALJ's decision was based on a determination that Plaintiff was not disabled prior to his DLI and did not rest on the timing of his application.  Thus, even if the court considered Plaintiff's argument, Plaintiff was not harmed by the alleged false statement by USPS personnel.

D.    **Substantial Evidence in the Record Supports the ALJ's Decision**

Plaintiff argues generally that not all of his medical evidence was considered by the ALJ.[102]  The court has determined that the ALJ properly disregarded evidence post-dating Plaintiff's DLI.  The court liberally construes Plaintiff's argument to be that the ALJ's decision was not supported by substantial evidence in the record.  The ALJ conducted a thorough analysis of Plaintiff's

---

[101]    See id. pp. 40-41, 64, 71, 74.

[102]    See Doc. 1, Pl.'s Compl. p. 1; Docs. 16 & 19, Pl.'s Cross Mot. for Summ. J. pp. 1-2.

medical records and Plaintiff does not point to a specific issue. Accordingly, the court conducts a general review of the ALJ's factual and legal conclusions.

It is undisputed that Plaintiff was not engaging in a substantial gainful activity, step one of the five-step process.

Similarly, it is undisputed that Plaintiff has severe impairments, step two of the five-step process. Plaintiff's medical evidence from before 2010 all pertains to knee and back limitations, and documents his weight. Thus, the ALJ properly found that Plaintiff's severe impairments consisted of: degenerative disc disease with radiculopathy; (2) post lumbar fusion; (3) osteoarthritis of bilateral knees; and (4) obesity.[103] Because there was no medical evidence from the relevant period of Plaintiff's other alleged conditions such as anxiety or depression, the ALJ properly did not consider whether Plaintiff met the requirements for those conditions under the Listings. In accordance with step three of the five-step process, the ALJ next considered whether Plaintiff met the requirements in the Listings Sections 1.02 and 1.04 for knee and back disabilities, and Section 1.00(Q) for obesity.

**1.  Section 1.02 - Major Dysfunction of a Joint**

Section 1.02 of the Listings requires that the dysfunction of the joint include the "[i]nvolvement of one major peripheral

---

[103]   See Tr. 15.

weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b" or the "[i]nvolvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively as defined in 1.00B2c." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.

"Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(b)(1). "Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(c).

The ALJ found that Plaintiff did not meet the requirements for Section 1.02 of the Listings because he was "able to ambulate and perform fine and gross movements effectively" prior to his DLI.[104]

A substantial amount of Plaintiff's medical history prior to 2010 shows that he was consistently able to ambulate effectively and that he did not use an assistive device.[105] Plaintiff had difficulty with heel-to-toe walking at one appointment.[106] However,

---

[104]    See Tr. 16.

[105]    See Tr. 418, 421, 427, 429.

[106]    See Tr. 438.

that alone is not enough to meet the Listings' definition of ineffective ambulation. Additionally, Plaintiff was able to heel-to-toe walk without issue approximately three months later.[107] The court finds that there is substantial evidence supporting the ALJ's conclusion that Plaintiff was able to ambulate effectively.

There is no medical evidence from prior to 2010 that indicates that Plaintiff had any issues with either upper extremity. Accordingly, the court finds that there is substantial evidence supporting the ALJ's conclusion that Plaintiff was able to perform fine and gross movements effectively.

For these reasons, the court finds that substantial evidence supports the ALJ's conclusion that Plaintiff did not meet the requirements for Section 1.02 of the Listings.

### 2. Section 1.04 - Disorders of the Spine

For Plaintiff's spine and back impairments to qualify under Section 1.04 of the Listings it is necessary that one of the following three specific issues be present:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe

---

[107]    See Tr. 433.

burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(a)-(c). The ALJ found that Plaintiff does not meet the requirements of Section 1.04 because he lacked the requisite motor and sensory deficits and there was "no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication."[108]

There is no medical evidence that Plaintiff suffered from spinal arachnoiditis. While there is evidence that Plaintiff suffered from spinal stenosis, there is no medical evidence that Plaintiff's stenosis resulted in pseudoclaudication.[109] Furthermore, as discussed above, there is no medical evidence that Plaintiff was unable to ambulate effectively. Accordingly, the ALJ was correct in finding that Plaintiff did not meet the requirements of Section 1.04(b) or Section 1.04(c).

With regards to Section 1.04(a), the ALJ found that Plaintiff lacked the section's required motor and sensory deficits. Plaintiff's medical evidence consistently reveals that his reflexes, sensation, and pulses were intact in his lower

---

[108] See Tr. 16.

[109] See Tr. 424.

extremities and that his motor power was always rated as a five out of five by his doctors.[110]  Accordingly, the court finds that the ALJ's determination that Plaintiff does not meet the requirements of Section 1.04(a) is supported by substantial evidence.

For these reasons, the ALJ properly found that Plaintiff does not meet the requirements of Section 1.04.

### 3.    Section 1.00(Q) - Obesity

There is no Listing specifically for obesity alone.  However, the Listings state that "when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process . . . adjudicators must consider any additional and cumulative effects of obesity."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(a)-(c).  The ALJ found that Plaintiff was obese, but that "there is no evidence . . . of the requisite impact on musculoskeletal, respiratory, cardiovascular, or other body system functioning."[111]  Plaintiff's medical records show his weight, but do not go beyond that.  Given that there is no evidence that Plaintiff has a Listing-level impairment or that his obesity had any effect that gave him a Listing-level impairment, the ALJ correctly determined that Plaintiff's obesity does not meet the requirements of any Listing.  Thus, Plaintiff cannot be considered

---

[110]    See Tr. 418, 421, 426, 429, 431, 433, 436, 438, 440, 442.

[111]    See Tr. 16-17.

disabled under step three of the five-step process and the court must proceed to the remaining steps.

**4.    Plaintiff Is Not Capable of Performing Past Work**

It is undisputed that Plaintiff is unable to perform his previous work due to his severe impairments.  Accordingly, Plaintiff cannot be found to be not disabled under step four of the five-step process and the court proceeds to the fifth step.

**5.    Plaintiff Is Capable of Doing Other Work**

The final question remaining before the court is whether substantial evidence exists that Plaintiff can do other work considering Plaintiff's age, education, past work experience, and RFC.

The ALJ determined that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) (lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking about six hours total in an eight-hour workday; and sitting about six hours total in an eight-hour workday."[112]  However, the ALJ found that Plaintiff would have to "be afforded the option to sit and stand at will" and that he could "never climb ladders, ropes, or scaffolds.[113]

The ALJ found that while Plaintiff's impairments could cause his alleged symptoms, Plaintiff's "statements concerning the

---

[112]    <u>See</u> Tr. 17.

[113]    <u>See</u> Tr. 17.

26

intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ."[114] The ALJ also gave little weight to Dr. Shapiro's opinion that Plaintiff was totally disabled from work activity and could not return to work until further notice due to his back condition.[115] The ALJ gave the opinion little weight because it: (1) was "not supported by the objective medical evidence"; (2) the opinion was on issues "specifically reserved under the Regulations to the Commissioner;" and (3) the opinion was not entirely relevant because the question is whether Plaintiff could work at all, not whether he could go back to his old job.[116]

The ALJ must evaluate every medical opinion in the record and decide what weight to give each. See 20 C.F.R. § 404.1527(c). Generally, the ALJ will give more weight to medical sources who treated the claimant because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2); see also Greenspan, 38 F.3d at 237 (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); SSR 96-5p, 1996 WL 374183, at *2.

---

[114] See Tr. 18.

[115] See Tr. 21, 22, 426-428.

[116] See Tr. 21-22.

The ALJ is required to give good reasons for the weight given a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *5.

> When the determination or decision . . . is a denial[,] . . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record, it is to be given controlling weight. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization. 20 C.F.R. § 404.1527(c)(2). However, the ALJ is only required to consider these factors in deciding what weight to

give a medical source opinion; he is not required to record in writing every step of the process. 20 C.F.R. § 404.1527(c)("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we give to any medical opinion.")(emphasis added).

Here, the ALJ considered the opinions of Dr. Shapiro, only giving them little weight for a multitude of reasons as set out in the ALJ's decision. Namely, the ALJ found the following evidence to be indicative that Plaintiff was not completely disabled: (1) Plaintiff walked unassisted and was able to heel-to-toe walk; (2) Plaintiff's "motor power" was consistently rated five out of five; (3) Plaintiff's "deep tendon reflexes were 2+;" (4) "[t]here were no upper motor neuron findings;" (5) Plaintiff "did not have pain with hip range of motion;" (6) Plaintiff's sensation was intact; (7) "no tensions signs were elicited;" and (8) Plaintiff "had no pain with SI joint stress."[117] The ALJ articulated his reasoning and the reasons he provided demonstrate that his findings as to Dr. Shapiro's opinions and Plaintiff's RFC were supported by substantial evidence.

Humphreys, the vocational expert, testified that a person with Plaintiff's age during the relevant period, education, past work experience, and RFC, would be capable of working as a shredder,

---

[117]    See Tr. 24.

laundry sorter, and garment sorter.[118]  Based on this testimony, the ALJ concluded that through Plaintiff's DLI, Plaintiff "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy."[119]  Accordingly, the ALJ found that Plaintiff was not disabled through his DLI.[120]

There is no evidence suggesting that Humphreys' conclusion was incorrect.  Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff was capable of doing other work and, therefore, Plaintiff was not disabled through his DLI.

## IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's.

**SIGNED** in Houston, Texas, this 24th day of October, 2018.

_____
U.S. MAGISTRATE JUDGE

---

[118]    See Tr. 54-55.

[119]    See Tr. 26.

[120]    See Tr. 27.